# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-19-00078-CV

Appellants, 12636 Research Ltd.; Hsu Realty Company, Inc.; and Chi-kao Hsu //
Cross-Appellant, Indian Brothers, Inc. d/b/a Oak Liquor Cabinet

v.

Appellee, Indian Brothers, Inc. d/b/a Oak Liquor Cabinet //
Cross-Appellees, 12636 Research Ltd.; Hsu Realty Company, Inc.; and Chi-kao Hsu

FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-17-000755, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal of a judgment, entered after a bench trial, in a commercial landlord–tenant lease dispute. The judgment awarded some relief to each side—injunctive, declaratory, and monetary relief to the tenant, Indian Brothers, Inc., d/b/a Oak Liquor Cabinet, and a monetary offset to the landlord, 12636 Research Ltd. (Landlord), and its fellow aligned parties.[1] Landlord owns the subject property, in which tenant Indian Brothers runs a liquor store.

In nine issues, Landlord, Chi-kao Hsu, and Hsu Realty Company, Inc. (collectively, the Hsu Parties) challenge some of the trial court's rulings, reflected in its findings of fact and conclusions of law. In a sole cross-issue, Indian Brothers challenges the monetary offset awarded

---

[1] Landlord is a limited partnership in which Chi-kao Hsu individually and Hsu Realty Company, Inc. are partners. Hsu is the managing shareholder of Hsu Realty. Hsu Realty is also the property-management company for Landlord's properties.

to the Hsu Parties. We reverse the portion of the trial court's judgment awarding Indian Brothers expert fees but affirm the rest of the judgment.

## BACKGROUND[2]

**The Lease and Indian Brothers' history on the property.** In early 2007, Indian Brothers and Landlord entered into a lease under which Indian Brothers rented two adjoining suites in a commercial complex along U.S. Highway 183 in northwest Austin (the Lease). The complex includes several other suites, leased to other businesses, and common areas for use by all tenants, including portions of the parking lot.

Indian Brothers, owned and operated by Raju Malik, had been running its liquor store in the complex for some time. It began by leasing one suite in 1999 from Landlord's predecessor-in-interest. Customer parking in the complex was a problem. According to Malik, "[b]asically our parking [was] taken by restaurants," so he asked the then-landlord about parking spots. In 2000, Indian Brothers put in two red-and-white signs in front of the two parking spots immediately outside its store's front door to designate the spots as reserved for its customers. The landlord at the time gave Indian Brothers permission for the signs via fax. Also by 2000, in front of each of the same two parking spots, there were concrete wheel-stops, painted white with dark lettering and displaying the liquor store's name.

Landlord bought the complex in 2002. In 2004, Landlord and Indian Brothers entered into an amendment to the 1999 lease—their first agreement together. Indian Brothers' wheel-stops and two parking signs were still in place, and, as part of the 2004 lease amendment,

---

[2] The information in this section is taken from the evidence admitted at trial: exhibits admitted and testimony by Malik, Hsu, their experts, and others.

Indian Brothers sought a third parking spot. Handwritten on the amendment, and initialed by both Malik and Hsu, is: "one addl. reserved Parking Space between 3:00pm to 9:00pm every Wednesday and Friday." Indian Brothers therefore added a third red-and-white parking sign.

In 2007, Indian Brothers and Landlord entered into the Lease. It became effective May 1, 2007, replacing the 1999 lease and 2004 amendment. Under the Lease, Indian Brothers expanded by renting a second, adjoining suite in the complex. Indian Brothers added near the new suite five more wheel-stops like the existing ones, for a new total of eight designated parking spots, the number it has today. Malik asked Hsu about the added parking spots and signage for them. According to Malik, Hsu gave "[v]erbal permission" for the added spots and signage, which Malik acted on even though he did not get written permission. Malik recognized that the Lease required written permission for certain signage and that he did not have it. By contrast, Hsu said that he has never given Indian Brothers permission for the signage. When he would visit the property from time to time, he saw the signs himself and would then tell Malik to remove them.

Also in 2007, Indian Brothers put up an exterior LED sign. According to Malik, (1) Hsu gave oral permission for the LED sign too, and (2) the Hsu Parties never asked that he remove the LED sign until after Indian Brothers filed this suit.

In 2009, a Lease provision requiring Indian Brothers to pay Landlord a share of Common Area Maintenance—CAM charges—became an issue. Hsu Realty demanded $4,928 in unpaid CAM charges for 2007–2008. It claimed that $984 remained unpaid from 2007 and that although Indian Brothers paid $6,576 in 2008, Indian Brothers' share of the actual expense was $10,520, leaving $3,944 unpaid for that year. In hindsight, Hsu admitted that he miscalculated the amounts. Indian Brothers' attorney requested "material that would substantiate" what Hsu Realty claimed that it incurred to maintain the common areas and what it claimed that Indian Brothers

3

owed. Neither Indian Brothers nor its attorney received a response. Hsu explained why: he said to himself, "just forget it," and considered the amount demanded to be "very minimal additional income," so "it just wasn't worth it" to press the issue, and he "just never follow[ed] up."

In 2010, Indian Brothers emailed Hsu a proposal for a new sign for the liquor store on the side of the building. Hsu rejected the proposal because the building's façade could not bear the load, so Indian Brothers sent a proposal for a sign on the complex's marquee. The proposal depicted the marquee sign's proposed location and the existing LED sign. Hsu responded and conditioned his approval of the new marquee sign on Indian Brothers' paying certain outstanding charges, the costs to change the existing marquee, and extra related utilities. Indian Brothers abandoned the proposed marquee sign because Malik felt that Hsu's conditions amounted to paying for a new marquee for the complex. One attachment to Hsu's email response was a colored picture of the liquor store in which the LED sign was "[c]learly visible."

Around 2013, Hsu had the wheel-stops with the liquor store's name painted over. Soon after, Indian Brothers repainted them to again mark the spots as reserved for its customers.

**History surrounding Lease renewal versus a new proposed lease.** The Lease includes a 10-year renewal option, which Indian Brothers could exercise provided that it was "not in default" under the Lease. In September 2016, Malik emailed Hsu Realty personnel to exercise the option. In October, Malik sent a second message to exercise the option. Hsu Realty personnel stamped and initialed the October message as "received." Malik did not hear back about his renewal messages until November at the earliest. Hsu later admitted that the renewal messages were "timely . . . to renew under" the Lease's renewal option. Before these messages, Hsu had never given Malik any notice that he considered Malik to be in default under the Lease.

4

In November 2016, Hsu Realty's property manager, Michael Schinella, emailed all tenants in the complex, saying that they must remove unapproved parking signs and wheel-stops: "[A]ll of the illegal/unauthorized exclusive parking signs, including the paints on the wheel stops, need to be removed immediately. Starting December 15, landlord will start the removal process and charge the expenses to the tenants with such parking signs." The November notice was the first time Indian Brothers was notified in writing. Hsu had not done "anything physically to . . . remove those signs"; he "was thinking [he] will get to it one day" but did not "want to spend [his] resources to cure it," so "that's why it was . . . continued to be delayed and postponed."

In early December, Hsu sent Indian Brothers a new proposed lease with provisions different from those in the Lease. Hsu wanted the new lease rather than renewing the Lease, in part to eliminate the hassle of CAM charges and to roll that value into a higher rent amount that also reflected the complex's low vacancy. Malik responded to Hsu Realty personnel about the demand that Indian Brothers remove its parking signs and wheel-stops, but he did not remove them. Hsu responded by email to Malik that "we will remove your parking signs and have you responsible for the cost." According to Malik, this was the first time that the Hsu Parties demanded that Indian Brothers specifically, as opposed to all the complex's tenants generally, remove its parking signs. Malik also said that from the time Indian Brothers added the five new parking spots in 2007 to the time around renewal of the Lease in late 2016, no one told Indian Brothers that it "had illegal signs" or needed to remove its designated parking spots or parking signs.

Schinella followed up by email with Malik about the new proposed lease. Schinella demanded a written response to the new proposed lease or else the Hsu Parties would consider Indian Brothers to have waived its Lease renewal option. In that event, Schinella said, "Landlord

5

will start advertising and showing the space for [a] new prospective tenant." According to Hsu, this was "part of [his] plan to put pressure on Mr. Malik to sign" the new proposed lease.

Malik emailed Hsu Realty and explained that his prior lease allowed the signs and parking spots, Hsu approved the wheel-stops in 2007, and Indian Brothers had timely exercised its renewal option. Schinella emailed in response, telling Malik that "[i]t is [his] best interest that [he] sign the proposed" new lease "ASAP"; otherwise, "[t]here is no more time left for" Indian Brothers, and Hsu would "move on with a new tenant." Malik did not agree to the new proposed lease because its provisions differed from the Lease's.

Hsu concluded that Malik had refused to sign the new proposed lease, so he decided to collect more purportedly unpaid CAM charges from Indian Brothers. In December 2016, Schinella emailed Malik several letters, by which the Hsu Parties demanded a little over $52,000 for CAM charges for 2008–2017 plus interest. Hsu later admitted that the amount demanded was higher than what the Lease allowed. He said that he waited to raise the unpaid CAM charges until the time for Lease renewal to pressure Indian Brothers to sign the new proposed lease. To bring up past years' CAM charges when he did, Hsu relied on a No Waiver provision in the Lease, under which Landlord's "acceptance of rent," or certain "delay[s] in enforcing any obligation" of Indian Brothers', could not amount to a waiver by Landlord. According to Malik, before this December 2016 demand, Landlord had not mentioned unpaid CAM charges since 2009.

About the same time as the demand for CAM charges, Hsu Realty had Indian Brothers' wheel-stops painted over and its three parking signs removed, plus another tenant's parking sign. Hsu Realty invoiced Indian Brothers $610 for removing four parking signs, including the other tenant's sign, and painting the wheel-stops. Indian Brothers paid the invoice.

6

Also because of Hsu's conclusion that Malik had refused to sign the new proposed lease, Schinella published an online ad offering the suites that Indian Brothers was renting. The ad included a picture of the building and its store signs and described the premises as including "Great Signage" and "8 Designated Parking Spots in the shared parking complex."

In January 2017, and with the $52,000 demand for CAM charges still unpaid, Hsu Realty sent Indian Brothers a notice to vacate. The only "default" of the Lease that the notice raised was nonpayment of CAM charges. Three days after the date shown on the notice to vacate, Indian Brothers' attorney responded to the demand for CAM charges and the notice and explained that Indian Brothers had already renewed the Lease for 10 years under the renewal provision. The attorney also asserted violations of Indian Brothers' "possessory rights and quiet enjoyment" of the leased premises, including the removal of "parking signs that have been in place for years" and the demand for CAM charges "without supporting documentation." The attorney sought a meeting with the Hsu Parties to work through the issues.

The parties negotiated back and forth for some weeks. Despite several meetings, Indian Brothers did not receive documentation that it believed sufficient to support the CAM charges. Hsu still threatened to lock Indian Brothers out if it did not pay. Hsu later halted the negotiations, writing to Indian Brothers that it must pay the CAM charges before he would consider any lease renewal or counter-proposal for a new lease. Indian Brothers was current on its rent.

Five days later, Hsu Realty sent Indian Brothers a Notice of Default of the Lease, which cited the unpaid CAM charges as the default. Indian Brothers' attorney responded, sending the Hsu Parties two checks from Indian Brothers to pay under protest 2016–17 CAM charges and demanding documentation to support all the demanded charges.

7

**This lawsuit.** Soon after the lockout threat and Notice of Default, Indian Brothers filed this suit in February 2017. It sought injunctive, declaratory, and monetary relief based on the Lease as renewed under the 10-year option. It sought the injunctive and declaratory relief to define and enforce the renewed Lease's terms; to ensure that the already existing signage and designated parking spots could remain; and to prevent the Hsu Parties from taking possession of the leased premises, as they had threatened. Indian Brothers also pleaded breach of contract based on instances of Landlord "failing to recognize and comply with Indian Brothers, Inc.'s rights under the" Lease. The Hsu Parties answered; pleaded a general denial; and counterclaimed for injunctive, declaratory, and monetary relief, including unpaid CAM charges.

Soon after filing suit, Indian Brothers sought the first of two temporary restraining orders. The trial court granted the first TRO in March 2017, which forbade Landlord and Hsu Realty from pursuing nonjudicial eviction, lockout, or repossession proceedings for the premises.

In June 2017, the Hsu Parties' attorney demanded that Indian Brothers remove the LED sign and parking signs or else face a $50 fine under the Lease. Hsu later explained that he waited to address the signs until "the time that we are about to renew the" Lease, although he had always thought the LED sign and parking signs to be Lease violations. Hsu also explained that he was concerned that the building could not support the LED sign's weight. He said that he did not address the LED sign when it went up in 2007 because of family and medical issues at the time.

After the letter threatening a fine, Hsu Realty sent a letter to all tenants in the complex asking them to "[r]emove unauthorized signage" lest Landlord "take actions to cure your Lease violations." In that event, the letter said, the respective tenant would "be responsible for all costs incurred as a result of such actions as well as other potential financial or legal consequences." About a month later, Hsu Realty emailed all tenants asking that they "remove all the unauthorized

8

signage . . . by this Friday (July 28, 2017)"—two days later—or it would "remove all the remaining unauthorized items during this weekend (July 29 - July 30)." Indian Brothers' attorney told the Hsu Parties' attorney that he would seek a second TRO on July 28 to prevent the Hsu Parties from removing the LED sign. Hsu sent someone to the property on the morning of the 28th to remove the LED sign before the TRO hearing and before the weekend deadline specified in the email to all tenants. Hsu later recognized that this was a mistake and apologized for it.

Late in the afternoon of the 28th, the trial court granted the second TRO, which enjoined Landlord and Hsu Realty from removing or altering any signs, or from changing or blocking parking spots, at Indian Brothers' business. It also ordered Hsu to return the LED sign and authorized Indian Brothers to replace and maintain the sign. Indian Brothers hired a sign company to put the sign back up. Indian Brothers received two invoices relating to that work: (1) one that charged $250 for replacing the LED sign, $653 for buying certain parking signs, and $930 for mounting those parking signs and (2) a second that charged $2,110.88 for an engineer's work so that Indian Brothers could prove to Hsu that the LED sign was not unsafe.

Still later while this suit was pending, Malik learned that Indian Brothers lacked a required City of Austin permit for the LED sign and that the sign as it existed when Indian Brothers renewed the Lease violated Texas Alcoholic Beverage Commission (TABC) regulations. Before suit, according to Malik, Hsu had never said that the sign needed a permit, nor had TABC ever contacted him about the sign, though it had contacted him about a different sign some years earlier. Indian Brothers obtained the required City permit in 2018. As for the TABC regulations, Malik first learned about the LED sign's noncompliance from the Hsu Parties' court filings in this suit. Then TABC called him to discuss the issue, and he brought the sign into compliance. According to Malik, the parking signs and LED sign now have the required permits and comply with TABC

9

regulations. Related to these issues, the Lease has a Compliance with Laws provision, which requires Indian Brothers to procure any required permits or licenses and to comply with all applicable government requirements.

**Trial and appeal.** The parties tried the suit to the bench. The trial court entered judgment awarding Indian Brothers injunctive, declaratory, and monetary relief. It ruled that the Lease renewal was effective, that the Hsu Parties breached the Lease, and that Indian Brothers was entitled to specific performance of the Lease as renewed. It ordered the Hsu Parties to perform under the renewed Lease; declared that Indian Brothers could keep its then-existing signage and eight parking spots; enjoined the Hsu Parties from removing or altering the existing signage; and enjoined them from removing, altering, blocking, or otherwise impeding the eight parking spots. It awarded Indian Brothers $2,360.88 for the costs it incurred to reinstall the LED sign. It awarded Indian Brothers attorneys' fees, expert fees, expenses, and costs. And it awarded the Hsu Parties an offset stemming from certain CAM charges that Indian Brothers had not yet paid. It later entered findings of fact and conclusions of law.

The Hsu Parties then filed this appeal to challenge several of the trial court's rulings, as reflected in some of its findings and conclusions. Indian Brothers filed a cross-appeal to challenge the offset for unpaid CAM charges.

## STANDARD OF REVIEW

**Review of judgment supported by findings of fact and conclusions of law.** "We review findings of fact and conclusions of law according to their substance and not their title." *Kaspar-Wells v. Mowdy*, No. 03-06-00026-CV, 2007 WL 778135, at *2 (Tex. App.—Austin Mar. 16, 2007, no pet.) (mem. op.). When, as here, the parties try the suit to the bench, the court

10

enters findings of fact, and there is a reporter's record of the trial, the findings are reviewable for legal and factual sufficiency of the evidence by the same standards applied in reviewing evidence supporting a jury's answer.  *See Catalina v. Blasdel*, 881 S.W.2d 295, 296–97 (Tex. 1994).

**Trial court as factfinder in bench trial.**  In a bench trial, the trial court is the factfinder and sole judge of the credibility of the witnesses.  *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).  "Accordingly, the trial court may consider all the facts and circumstances in connection with the testimony of each witness and accept or reject all or part of that testimony." *Hailey v. Hailey*, 176 S.W.3d 374, 383 (Tex. App.—Houston [1st Dist.] 2004, no pet.).  The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any testimony. *McGalliard*, 722 S.W.2d at 697.  "An appellate court may not substitute its judgment for the trial court's assessment of witnesses' testimony in a bench trial."  *Hailey*, 176 S.W.3d at 383.

**Inferring omitted findings.**  Whether we must infer unrequested findings of fact that the trial court's findings omitted depends on whether the trial court found at least one other element necessary to support the ground of recovery or defense in question:

> When findings of fact are filed by the trial court they shall form the basis of the judgment upon all grounds of recovery and of defense embraced therein.  The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact; but when one or more elements thereof have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment.

Tex. R. Civ. P. 299.  This rule is part of the standard for appellate review of findings of fact after a bench trial.  *See Walterscheid v. Walterscheid*, 557 S.W.3d 245, 257 n.11 (Tex. App.—Fort Worth 2018, no pet.); *Stapel, LP v. Scott & White Mem'l Hosp.*, No. 03-16-00750-CV, 2018 WL 386675, at *1 (Tex. App.—Austin Jan. 3, 2018, pet. denied) (mem. op.).

11

"It is the appellant's duty to attack the express and implied findings." *Smith v. McDaniel*, No. 12-12-00165-CV, 2013 WL 5302492, at *4 (Tex. App.—Tyler Sept. 18, 2013, no pet.) (mem. op.); *Long v. Long*, 234 S.W.3d 34, 42 (Tex. App.—El Paso 2007, pet. denied). "Where deemed findings arise, it is not an appellee's burden to request further findings or to complain of other findings made." *Long*, 234 S.W.3d at 42. The appellant must have requested the relevant additional findings in the trial court to avoid inferred findings on appeal. *Howe v. Howe*, 551 S.W.3d 236, 248 (Tex. App.—El Paso 2018, no pet.) ("[W]hen the court's findings of fact include one or more elements of a claim or defense, but omits others, the omitted elements will be presumed (if supported by the evidence) unless a party timely files a request for additional findings of fact asking the court to make findings regarding the omitted elements. It seems counterintuitive that you should ask the court to make a finding against you, but it is necessary in order to attack that element on appeal. . . . [T]he failure by a party to request additional amended findings or conclusions waives the party's right to complain on appeal about the presumed finding." (internal quotation and citation omitted)).

By Rule 299's terms, so long as at least one element of a ground of recovery or defense is found, when the trial court's express findings do not otherwise address all of the elements of the ground of recovery or defense, an appellate court infers the omitted findings needed to support the judgment. *Fox v. O'Leary*, No. 03-11-00270-CV, 2012 WL 2979053, at *3 (Tex. App.—Austin July 10, 2012, pet. denied) (mem. op.). And even when there are express findings of fact, still "[i]t is presumed that all fact findings needed to support the judgment were made by the trial court." *Pulley v. Milberger*, 198 S.W.3d 418, 427 (Tex. App.—Dallas 2006, pet. denied); *accord Tex-Air Helicopters, Inc. v. Galveston Cnty. Appraisal Rev. Bd.*, 76 S.W.3d 575, 585–88 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

DISCUSSION

We address the Hsu Parties' nine issues and then Indian Brothers' cross-issue.

## I.      Effects of Lease's No Waiver provision

In their first issue, the Hsu Parties contend that the trial court erred by "basing its legal conclusions on a finding that [Landlord] delayed in enforcing the signage requirements until after" Indian Brothers exercised the renewal.  The Hsu Parties raise both a Lease-interpretation argument and an evidentiary-sufficiency argument.  Their Lease-interpretation argument is that the No Waiver provision makes any waiver by Landlord insufficient to support judgment for Indian Brothers.  Their evidentiary-sufficiency argument is that "the evidence in the record conclusively establishes" the lack of any waiver by Landlord.

Our task in interpreting the Lease is to determine and enforce the parties' intent as expressed within the four corners of the written agreement.  *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020).  The proper interpretation of an unambiguous lease is a question of law determined de novo.  *Id.*  To determine unambiguous language's meaning, we look not for the parties' actual intent but for their intent as expressed in the written document.  *Id.* at 744.  We consider the entire agreement and, as much as possible, resolve any conflicts by harmonizing the agreement's provisions.  *Id.*

As for evidence sufficiency, when reviewing the evidence supporting findings of fact, evidence is legally insufficient when (1) the record bears no evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact.  *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017).  More than a scintilla of evidence exists if the

13

evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). When reviewing for legal sufficiency, we must consider evidence favorable to the challenged finding if the factfinder could reasonably do so and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Shields*, 526 S.W.3d at 480. When the party challenging the legal sufficiency of the evidence supporting a finding did not have the burden of proof on that issue, the party must show "that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). When the party did have the burden of proof, he or she must show that "the record conclusively establishes all vital facts in support of the issue." *Shields*, 526 S.W.3d at 480.

When reviewing for factual sufficiency, we examine the entire record and weigh all the evidence, whether it supported the disputed finding or not. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); *Fox*, 2012 WL 2979053, at *3. When the party disputing the factual sufficiency of the evidence supporting a finding did not have the burden of proof on that issue, the party must show that the evidence for the finding "is so weak as to be clearly wrong and manifestly unjust." *Saltworks Ventures, Inc. v. Residences at the Spoke, LLC*, No. 03-16-00711-CV, 2018 WL 2248274, at *6 (Tex. App.—Austin May 17, 2018, no pet.) (mem. op.). When the party did have the burden of proof, the party must show that the finding "is against the great weight and preponderance of the evidence." *Fox*, 2012 WL 2979053, at *3. In a factual-sufficiency review, "[w]e may not substitute our own judgment for that of the factfinder, even if the evidence would support a different result." *Saltworks Ventures*, 2018 WL 2248274, at *6.

14

The Hsu Parties' arguments rely in part on the Lease's Signs provision, which says:

> [Indian Brothers] will not place or suffer to be placed or maintained on the exterior of the Leased Premises or in the parking area or sidewalks any sign, advertising matter, or any other thing of any kind . . . without first obtaining [Landlord]'s written approval and [Indian Brothers] will maintain such signs, lettering, advertising matter of [sic] the other things as may be approved in good condition and repair at all times.  [Landlord] may assess fines of up to $50.00 each for each violation of this restriction.  In the event that 3 or more such fines are assessed by [Landlord] within any period of six months, [Indian Brothers] shall be on probation and the [Landlord] shall be entitled to take such further actions, and shall have such further remedies as are provided in this Lease.

The Hsu Parties argue that Indian Brothers never had "written approval" and that the wheel-stops and signage were thus Lease violations.

In another provision, the Lease designated the complex's parking lot as a Common Area.  The provision subjected all parts of the Common Area "to [Landlord]'s sole management and control" and forbade Indian Brothers from "tak[ing] any action which would interfere with rights of other persons to use the Common Area without the prior written consent of the [Landlord]."  The Hsu Parties argue that Indian Brothers' parking spots, wheel-stops, and related signage violated this provision too.

Further, the Lease's renewal provision required Indian Brothers not to be "in default" under the Lease in order to exercise the renewal option:

> Provided [Indian Brothers] is not in default hereunder, [Landlord] agrees to grant [Indian Brothers] the right to extend this Lease for 1 period of 10 year(s), provided that [Indian Brothers] shall give notice in writing at least 60 days prior to the termination of the Lease period of its exercising the option to extend.

The Hsu Parties argue that without any action necessary on Landlord's part, Indian Brothers' pre-renewal violations of the Signs and Common Area provisions prevented an effective renewal

15

of the Lease. Indian Brothers argued in the trial court, and argues on appeal, that Landlord had already waived Indian Brothers' obligations under those provisions before it renewed the Lease because of Hsu's orally agreeing to the current signs and parking spots before renewal without requiring written approval.

The relevant provisions of the Lease are unambiguous. Thus, interpreting and applying the Lease's provisions are questions of law, reviewed de novo. *See Piranha Partners*, 596 S.W.3d at 743. We review conclusions on questions of law de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although conclusions of law may not be challenged for factual insufficiency, we may review the legal conclusions drawn from the facts to determine their correctness. *DPRS 15th St., Inc. v. Texas Skyline, Ltd.*, No. 03-11-00101-CV, 2014 WL 4058796, at *4 (Tex. App.—Austin Aug. 13, 2014, no pet.) (mem. op.). If a conclusion of law is erroneous but the trial court still rendered the proper judgment, the erroneous conclusion does not require reversal. *BMC Software Belg.*, 83 S.W.3d at 794. We will uphold the conclusions if we can sustain the judgment on any legal theory supported by the evidence. *DPRS 15th St.*, 2014 WL 4058796, at *4.

Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 676 (Tex. 2020). Waiver is a fact question when the surrounding facts and circumstances are disputed. *Id.* at 676–77. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely on such right. *Id.* at 677. Thus, to establish waiver by conduct, that conduct must be unequivocally inconsistent with claiming a known right. *Id.*

16

The ordinary rules of waiver are altered here by the Lease's No Waiver provision. Contractual nonwaiver provisions are generally binding and enforceable. *Shields*, 526 S.W.3d at 481. A party may expressly or impliedly waive its rights under a nonwaiver provision. *Id.* at 482–83. To do so, the party must "manifest clear intent to waive the nonwaiver provision"; "[o]therwise, the nonwaiver provision is facially dispositive" that no waiver may occur on the terms set forth in the nonwaiver provision. *See id.* at 481.

In *Shields*, the nonwaiver provision in the parties' lease required all waivers to "be in writing and signed by the waiving party" and provided that the "[l]andlord's failure to enforce any provisions of this Lease or its acceptance of late installments of Rent shall not be a waiver and shall not estop Landlord from enforcing that provision or any other provision of this Lease in the future." *Id.* Under that provision, "accepting late rental payments" was "the very conduct disclaimed as a basis for waiver" and thus "could not waive the parties' agreement that contractual rights, remedies, and obligations will not be waived on that basis." *Id.* at 484. The landlord's acceptance of late rent payments was "insufficient as a matter of law to nullify the nonwaiver provision." *Id.* at 484–85.

The No Waiver provision at issue here is different. It addresses Landlord's "acceptance of rent" and "delay in enforcing any obligations" and, later in different terms, "failure to enforce . . . default provisions":

> No acceptance of rent by [Landlord] or delay in enforcing any obligation shall be construed as a waiver of any default in the performance of any obligation to be undertaken by [Indian Brothers]. [Landlord]'s failure to enforce the default provisions hereof in the event of [Indian Brothers'] default hereunder shall not act as a waiver of [Landlord]'s right to enforce the default provisions hereof in the event of a subsequent breach thereof by [Indian Brothers].

17

This provision, as even the Hsu Parties recognize in their reply brief, "does not require that all waivers must be in writing."

Relying on the No Waiver provision, the Hsu Parties' Lease-interpretation argument targets Finding of Fact 9, which says, "Although fully aware of their existence, [the Hsu Parties] never asserted any right to remove Plaintiff's signs or parking spaces until after Plaintiff had exercised its option to renew." They argue that the finding is erroneous because of the No Waiver provision and, if so, that Conclusions of Law 1–6 are too. Those conclusions address (1) Indian Brothers' performance under the Lease and timely renewal; (2) the Hsu Parties' breach of the Lease; (3) Indian Brothers' entitlement to a declaratory judgment of the renewed Lease's terms; (4) Indian Brothers' entitlement to a declaratory judgment on its rights to its existing store signs, parking signs, parking spots, and wheel-stops; (5) Indian Brothers' entitlement to specific performance of the renewed Lease; and (6) Indian Brothers' entitlement to a permanent injunction enjoining the Hsu Parties from removing or altering Indian Brothers' signage and from removing, altering, blocking, or otherwise impeding Indian Brothers' parking spots. In sum, the argument goes, Indian Brothers could not effectively renew the Lease because its signage and parking-spot violations constituted breaches of the Lease, and without a renewed Lease, Indian Brothers is not entitled to the specific-performance, injunctive, and declaratory remedies it was awarded.

Under the governing standards, we agree with a portion of the Hsu Parties' first issue: as a matter of law, the portion of Finding of Fact 9 that says "Defendants never asserted any right to remove Plaintiff's signs or parking spaces until after Plaintiff had exercised its option to renew" cannot support a waiver because of the No Waiver provision. The provision prohibits Landlord's "delay in enforcing any obligation" from constituting a waiver. Landlord's pre-renewal failure to assert rights to remove Indian Brothers' signage and designated parking

18

spots by not pursuing removal remedies is a delay in enforcing obligations under the Lease. It is thus "the very conduct disclaimed as a basis for waiver" in the No Waiver provision. *See Shields*, 526 S.W.3d at 484. The conduct mentioned in this portion of Finding of Fact 9 is therefore "insufficient as a matter of law to nullify the nonwaiver provision." *Id.* at 484–85.

But this is not the end of our inquiry. *See Tex-Air Helicopters*, 76 S.W.3d at 585 (holding that evidence was sufficient to supply inferred finding despite related express finding's not being supported by sufficient evidence, noting that review of express finding "does not end our inquiry because we still have to determine" sufficiency of evidence for inferred finding) (citing Rule 299)). Indian Brothers points out that the challenged finding of fact "is not the only basis to support the trial court's conclusions, so there has been no error." In that vein, we note that the trial court reached Conclusions of Law 1–6 based on waiver: Indian Brothers performed and the Lease renewal was effective despite any violation of the Signs or Common Area provisions by Indian Brothers because, the trial court ruled, Landlord had waived Indian Brothers' obligation to obtain written approval for the existing signs and parking spaces. Waiver was also the thrust of Finding of Fact 9 ("Although fully aware of their existence, Defendants never asserted any right to remove Plaintiffs['] signs or parking spaces until after Plaintiff had exercised its option to renew."), and the parties contested at trial whether Landlord in fact waived, or legally could have waived, any of the parties' Lease obligations.

In the trial court, the Hsu Parties did not request further findings on waiver. Instead, they objected to Finding of Fact 9 "as against the great weight of the evidence" and requested that the court add to it "a finding that the lease, the subject matter of this lawsuit, had a no waiver clause." It is undisputed that the Lease contained its No Waiver clause. But to attack any implied

findings of fact made by the trial court on waiver, the Hsu Parties needed to have requested further specific fact findings about waiver, and they did not do so. *See Howe*, 551 S.W.3d at 248.

Therefore, if a waiver beyond the reach of the No Waiver provision is otherwise supported by the evidence, then it is a valid legal theory on which we must sustain the trial court's conclusions. *See DPRS 15th St.*, 2014 WL 4058796, at *4. And because the findings of fact include a finding on at least one of the elements of waiver, the "known right" of the Hsu parties to remove signs or parking spots, we must infer any omitted findings on inconsistent intentional conduct to support the trial court's judgment on waiver. *See* Tex. R. Civ. P. 299; *Buxani v. Nussbaum*, 940 S.W.2d 350, 352–53 (Tex. App.—San Antonio 1997, no writ) (inferring omitted "mutual assent" finding because it was necessary to support trial court's judgment for plaintiff on his contract claim and on defendant's contract counterclaim against him (citing Tex. R. Civ. P. 299)); *Electro-Hydraulics Corp. of Am. v. Special Equip. Eng'rs, Inc.*, 411 S.W.2d 382, 387 (Tex. App.—Waco 1967, writ ref'd n.r.e.) (noting that any missing waiver finding necessary to support trial court's judgment in plaintiff's favor in contract suit "would be required" to be inferred by court of appeals "in favor of sustaining the trial court," where suit was tried to bench and trial court entered findings of fact and conclusions of law (citing Tex. R. Civ. P. 299)).

As for the evidence on waiver, Malik and Hsu both testified about oral permission for Indian Brothers' signage and designated parking spots—Malik testified that Hsu had given it,[3]

---

[3] Crediting Malik's testimony, permission was given after the Lease was executed in 2007:

Q. So how many parking spaces are you saying today that you had after 2007 lease was signed? How many total?

A. Eight wheel-stoppers—

and Hsu testified that he had not. The trial court had a right to credit Malik's testimony above Hsu's, and we may not undermine that assessment. *See McGalliard*, 722 S.W.2d at 696. Oral permission given to Indian Brothers is not, under the No Waiver provision, a mere "delay in

Q. Okay.

A. —three parking sign.

Q. Okay. Did you ask your landlord for permission to do those additional parking spaces?

A. Verbal permission.

Q. Did you ask him for permission; yes or no?

A. Yes.

Q. Okay. Did he answer you? Don't tell me what he said. Did he answer you verbally?

A. Yes.

Q. Okay. And did you act on his answer?

A. Yes.

 . . . .

Q. So from the time you had your signs in place and your parking, after your 2007 lease was signed until you tried to renew your lease, had your landlord told you you had illegal parking spaces?

A. 2007?

Q. From the time you added the extra parking spaces until you tried to renew your lease, were you ever told by your landlord to remove your parking spaces?

A. After—not till that time when I—or give my option.

Malik also testified that he added the new parking spaces after he finished building out the interior of the second suite that he rented by virtue of the Lease. From Malik's testimony, then, the trial court could have reasonably found that the permission from Hsu came after the Lease was executed because it came after he added the new parking spots, which followed building out the new suite, which itself followed entering into the Lease.

21

enforcing an[] obligation" or "failure to enforce a[] default provision[]." It is instead an affirmative statement that Indian Brothers could keep its signage up and parking spots designated, in other words, intentional conduct inconsistent with Landlord's known right to remove Lease-violating signage or designated parking spots. The oral permission thus falls outside the No Waiver provision's ambit. *See Shields*, 526 S.W.3d at 481–85. And it is supported by legally sufficient evidence. *See id.* at 480; *Ford Motor*, 135 S.W.3d at 601.

The omitted finding on waiver of inconsistent intentional conduct, stemming from oral permission, supports the trial court's waiver-based conclusions, so we must infer that finding. *See* Tex. R. Civ. P. 299; *Electro-Hydraulics*, 411 S.W.2d at 387; *see also Tex-Air Helicopters*, 76 S.W.3d at 585–88 (noting that cross-appellant was correct that certain findings were not supported by sufficient evidence but nevertheless overruling cross-appellant's related appellate issue because Rule 299 inferred findings supplied what was otherwise missing). Thus, a valid waiver theory supports the conclusions that the Hsu Parties challenge, so we uphold the trial court's conclusions about the Hsu Parties' having waived the obligations under the Signs and Common Area provisions as to the already existing parking spots and signs, which the Hsu Parties argue prevented an effective renewal under the renewal option. We overrule the Hsu Parties' first issue.

## II.    No error in rulings that Indian Brothers performed and timely renewed

In their second issue, the Hsu Parties contend that the evidence is legally and factually insufficient to support the portion of Conclusion of Law 1 that says that Indian Brothers "performed its Lease obligations and timely exercised the Lease renewal option." They advance several arguments in support of this contention, which we address each in turn. We review the

22

evidence-sufficiency arguments, the arguments complaining of conclusions of law, and those about the provisions of the Lease under the respective standards laid out above.

**Applicable law.** The elements of a contract cause of action are (1) the existence of a valid contract; (2) the plaintiff's performance, or tender of performance, as the contract required; (3) the defendant's breach by failure to perform, or to tender performance, as the contract required; and (4) damages to the plaintiff resulting from the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018); *Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d 73, 82 (Tex. App.—Austin 2003, pet. denied). The portion of Conclusion of Law 1 about timely exercise of the Lease renewal implicates the "existence of a valid contract" element of Indian Brothers' claim, and the performance portion implicates the performance element.

**Findings that Indian Brothers "satisfied specific Lease requirements."** The Hsu Parties begin by arguing that the trial court "issued no findings that Indian Brothers actually satisfied specific Lease requirements." On the contrary, the trial court found that Indian Brothers paid rent in accord with the parties' agreement, paid CAM charges pursuant to an agreement, performed the renewal option, and "performed its obligations under" the Lease. To the extent that the Hsu Parties argue that these findings do not suffice, because the trial court made at least one finding about the elements of Indian Brothers' contract cause of action, we are to infer any other necessary omitted findings. *See* Tex. R. Civ. P. 299; *Fox*, 2012 WL 2979053, at *3. Because the Hsu Parties do not argue which inferred findings are unsupported by sufficient evidence, this first argument is not a ground for reversal. *See Shoshana Diamonds, Inc. v. Diamond Collection Co.*, No. 01-17-00202-CV, 2018 WL 5986435, at *2 (Tex. App.—Houston [1st Dist.] Nov. 15, 2018, no pet.) (mem. op.) (per curiam) ("To prevail on appeal, an appellant must attack all independent grounds supporting a judgment. If the appellant fails to do so, the appellate court 'must accept the

23

validity of that unchallenged independent ground' and affirm the judgment." (internal citations omitted)); *accord Haubold v. Medical Carbon Rsch. Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008, at *3 (Tex. App.—Austin Mar. 14, 2014, no pet.) (mem. op.).

**No default precluding renewal and sufficient evidence to support renewal.** The Hsu Parties continue by arguing that the trial court "erred in concluding that Indian Brothers performed all conditions precedent to Lease renewal" because Indian Brothers was purportedly in "default" under the Lease, precluding renewal under the renewal provision. The default that the Hsu Parties put forward is that "Indian Brothers did not comply with the Lease's 'Signs' and 'Compliance with Laws' provisions." Both types of alleged noncompliance stem from Indian Brothers' signs on the property: the laws that the Hsu Parties believe are relevant under the Compliance with Laws provision are the TABC regulations about signage at liquor stores.

Under the Lease's Signs provision, Landlord was given specific remedies that it must pursue before it could resort to others: $50.00 fines for each violation and then "further actions" and "further remedies as are provided in this Lease" only after three fines had been assessed. As to fines, the most the evidence shows is that Landlord once threatened to fine Indian Brothers for violations before the Lease was renewed by Malik's Sept.–Oct. 2016 renewal messages but only actually assessed a fine after the Lease had been renewed. Therefore, even assuming that Landlord could reject an otherwise-proper Lease renewal by Indian Brothers as one of the "further actions" or "further remedies" contemplated by the Signs provision, Landlord could not avail itself of that here because it had not assessed at least three $50 fines before the renewal. The Hsu Parties' challenge to Conclusion of Law 1 as far as it relates to Lease renewal thus fails.

As for the evidence supporting an effective renewal, the Hsu Parties do not dispute that Malik's Sept.–Oct. 2016 messages were timely under the Lease and effective, absent an

instance of default, to renew. The notices were in evidence, and Hsu admitted their effectiveness on cross-examination. Thus, legally and factually sufficient evidence supported the trial court's ruling that Indian Brothers timely exercised the lease renewal. *See Graham Cent. Station*, 442 S.W.3d at 263; *Saltworks Ventures*, 2018 WL 2248274, at *6.

**Performance finding.** Finally, the Hsu Parties argue that Indian Brothers did not perform, and did not tender performance, because it "violated the express terms of the Lease." The violations they put forward are Indian Brothers' putting up and keeping up signs not approved by Landlord or in violation of TABC regulations and designating more parking spots than Landlord allowed. These alleged violations, however, are the subject of the waiver findings as to the oral permission that we must infer, as explained above, and the signs were brought into compliance promptly after Malik became aware of their non-compliance. Waiver of the contractual right to require written permission for the existing signs and parking spaces meant that Indian Brothers was not required to perform the waived obligation of obtaining written approval. *See R. Conrad Moore & Assocs., Inc. v. Lerma*, 946 S.W.2d 90, 93–94 (Tex. App.—El Paso 1997, writ denied) (concluding that party need not refund earnest money under contractual provision because counterparty waived that provision); *Group Hosp. Servs., Inc. v. One & Two Brookriver Ctr.*, 704 S.W.2d 886, 890 & n.1 (Tex. App.—Dallas 1986, no writ) (concluding that tenant was liable under oral agreement to reimburse landlord for electricity costs despite written lease's provision preventing oral modifications because "[t]he jury found that the parties had waived the writing requirement," so "waiver disposes of the oral modification clause"). The alleged signage and parking-spot violations as to the already existing signs and parking spots thus do not amount to a failure to perform.

25

As to Indian Brothers' performance otherwise, the Hsu Parties do not dispute that Indian Brothers has paid rent as required and was current on rent up to and beyond Malik's renewal messages. Indian Brothers then filed suit in February 2017. The Hsu Parties answered and have not alleged nonpayment of rent. The parties entered into a Rule 11 agreement in April 2017 to govern rent payments through "the exhaustion of any appeals." There is no allegation that Indian Brothers has failed to pay rent as required by the Lease or the Rule 11 agreement.

Payment of rent, signage, and parking spots aside, the Hsu Parties do not raise on appeal any other nonperformance by Indian brothers. Thus, legally and factually sufficient evidence supported the ruling that Indian Brothers performed under the Lease. *See Graham Cent. Station*, 442 S.W.3d at 263; *Saltworks Ventures*, 2018 WL 2248274, at *6.

For all these reasons, we overrule the Hsu Parties' second issue.

### III.    No error in breach finding

In their third issue, the Hsu Parties contend that insufficient evidence supports the ruling that they breached the Lease. They argue that "enforcing [Indian Brothers'] signage obligations"; "insisting that Indian Brothers cure its defaults by complying with Lease terms, including signage requirements, before extending the Lease"; and "remov[ing] . . . the LED sign" were not breaches.

Courts determine whether a contract party breached "by comparing the terms of [the] contract with the actions of the alleged breaching party." *Enron Oil & Gas Co. v. Joffrion*, 116 S.W.3d 215, 221 (Tex. App.—Tyler 2003, no pet.) (citing *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966)); *see, e.g.*, *Saltworks Ventures*, 2018 WL 2248274, at *6 (analyzing sufficiency of evidence to support finding that landlord breached by comparing contract provision

establishing landlord's obligation to evidence of landlord's relevant acts and omissions). A breach occurs when the party "fails to perform an act that it has expressly or impliedly promised to perform." *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center E., Inc.*, 290 S.W.3d 554, 561 (Tex. App.—Dallas 2009, no pet.).

We need not reach the Hsu Parties' arguments about their actions over Indian Brothers' signs because refusing to recognize Indian Brothers' tenancy under the renewed Lease, for example, by threatening a lockout and sending the notice to vacate, was a breach. The Lease provided that if it was properly renewed, its renewed term would be extended by 10 years and that "[a]ll terms of the Lease shall remain the same" (except certain rent-amount provisions). We have already upheld the conclusion that Indian Brothers' Lease renewal was effective, so the refusal to recognize the renewal constitutes a failure to abide by Landlord's express or implied promise to perform under the Lease for the renewed 10-year term. *See id.* We overrule the Hsu Parties' third issue.

## IV. No error in declarations authorizing Indian Brothers to keep existing signage and parking spots under renewed Lease

In their fourth issue, the Hsu Parties contend that the trial court erred by "entering a declaratory judgment extending the Lease term and modifying the parties' written agreement to permit [Indian Brothers] to keep its existing signs." By this issue, the Hsu Parties target Conclusions of Law 1, 3, and 4, which addressed, respectively, Indian Brothers' performance under the Lease and timely renewal; its entitlement to a declaratory judgment of the renewed Lease's terms; and its entitlement to a declaratory judgment of its rights to its existing store signs, parking signs, parking spots, and wheel-stops. The Hsu Parties argue that all these rulings amount

27

to an unauthorized judicial rewriting of the Lease, saying that the rulings "rewrite the Lease to include authorization for signs."

The trial court's declarations, however, do not amount to a rewriting of the Lease. It is the Hsu Parties' waiver by intentional conduct related to Indian Brothers' already existing signage and parking spots that allows Indian Brothers to maintain those signs and parking spots as they exist. *See R. Conrad Moore & Assocs.*, 946 S.W.2d at 93–94 (considering intentional conduct after contractual right arose to conclude waiver of that right); *Group Hosp. Servs.*, 704 S.W.2d at 890 & n.1 (explaining that parties may waive enforcement of provision forbidding oral modifications). We overrule the Hsu Parties' fourth issue.

## V.      No error in grant of specific performance of renewed Lease

In their fifth issue, the Hsu Parties contend that the trial court erred by granting "specific performance of the Lease extension with modified terms permitting [Indian Brothers] to keep its existing signs." By this issue, they target Conclusion of Law 5, which says that Indian Brothers "is entitled to specific performance for the lease renewal."

They first argue that specific performance of the renewed Lease, without reimposing on Indian Brothers the Lease's signage and parking-spot requirements, is error. But we reject that argument for the same reasons that we did under the Hsu Parties' fourth issue. It is their waiver of written approval for the existing signs and parking spots that supports the trial court's remedy of specific performance concerning Indian Brothers' specified rights to keep its existing signage and parking spots.

Then the Hsu Parties re-urge their argument that Indian Brothers breached "the Lease's signage requirements" and failed to "satisfy all conditions precedent" to renewal. We

28

reject these arguments for the same reasons that we did under the Hsu Parties' second issue. As we concluded above, the Lease renewal was effective, sufficient evidence supports that ruling, and the Hsu Parties waived the relevant Lease provisions as far as they relate to the existing signage and parking spots.

We overrule their fifth issue.

## VI. No abuse of discretion in injunction about Indian Brothers' existing signage and parking spots

In their sixth issue, the Hsu Parties contend that the trial court improperly "permanently enjoin[ed] [them] from removing or interfering with Indian Brothers' existing signs or reserved parking spaces throughout the ten-year Lease extension." This issue targets Conclusion of Law 6, which says that

> Plaintiff is entitled to a permanent injunction for the term of Plaintiff's lease renewal described above, enjoining Defendants and their respective officers, agents, attorneys, employees, and other representatives from, directly or indirectly: (a) removing or altering any of Plaintiff's existing signs or signage or (b) removing, altering, blocking or otherwise impeding Plaintiffs' eight reserved parking spaces.

The Hsu Parties argue that this injunctive relief, as an equitable remedy, cannot stand because it results from the trial court's improperly "weigh[ing] the conveniences and hardships of the parties" and improperly "balanc[ing] the equities." They say that "the hardship and inequity of precluding [Landlord] from regulating all signs placed on its building and in its parking lot throughout the ten-year Lease extension term" outweighs any "inconvenience" to Indian Brothers "in seeking and obtaining [Landlord]'s approval for . . . signage."

We review a permanent injunction for an abuse of discretion. *Bloys v. Wilson*, No. 03-03-00193-CV, 2004 WL 162974, at *11 (Tex. App.—Austin Jan. 29, 2004, pet. denied)

29

(mem. op.). "This Court may not reverse for abuse of discretion merely because we disagree with the decision of the trial court. A clear abuse of discretion arises only when the trial court's decision is not supported by some evidence of substantial and probative character." *Id.* The trial court does not abuse its discretion when its decision is based on conflicting evidence, at least some of which reasonably supports its decision. *1717 Bissonnet, LLC v. Loughhead*, 500 S.W.3d 488, 500 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 691 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

When exercising its equitable injunctive authority, a trial court must "balance competing equities." *In re Gamble*, 71 S.W.3d 313, 317 & n.10 (Tex. 2002) (orig. proceeding); *see also* Tex. Civ. Prac. & Rem. Code § 65.001; Tex. R. Civ. P. 693. To do so, the court should consider the injury to the opposing party if relief is granted against the injury to the plaintiff if it is denied. *Storey v. Central Hide & Rendering Co.*, 226 S.W.2d 615, 618–19 (Tex. 1950). If the injury to the plaintiff is slight compared with the injury to the defendant, relief will ordinarily be denied, but if "the injury to the opposing party . . . is slight or disproportionate to the injury suffered by the" plaintiff, then the "injunction may issue." *See id.* at 619.

A trial court should hear evidence about how to balance the equities. *Lamb v. Kinslow*, 256 S.W.2d 903, 905 (Tex. App.—Waco 1953, writ ref'd n.r.e.). The court is "authorized to draw inferences and conclusions from the evidence in balancing the hardships and equities." *Holubec v. Brandenburger*, 58 S.W.3d 201, 212 (Tex. App.—Austin 2001), *rev'd on other grounds*, 111 S.W.3d 32 (Tex. 2003). On appeal, we may rely on inferred findings to support a trial court's conclusion on the balance of the equities. *See State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 804 (Tex. 1979) (affirming permanent injunction based both on jury findings and on conclusion that "[t]he trial court necessarily determined that future violations of the statutes were likely to

occur when it rendered its judgment granting the injunction"); *Indian Beach Prop. Owners' Ass'n*, 222 S.W.3d at 691 ("The trial court did not abuse its discretion in declining to award injunctive relief because the record supports an implied finding that Indian's own inaction resulted in the presumed approval of Linden and B.J.'s fence; thus, Indian fails to show that the balance of the equities plainly favors it.").

Here, the trial court's judgment is different from how the Hsu Parties' arguments characterize it. The judgment says that Indian Brothers "may modify its existing signs and the marking on its reserved parking spaces as needed to comply with Texas Alcoholic Beverage Commission, City of Austin, and other applicable laws and regulations without need for approval by [L]andlord/Defendants" and that "[a]ny other signage changes or additions by Plaintiff shall be subject to Landlord's approval pursuant to the Lease Agreement, Section 25 [('Signs')]."

Indian Brothers raises the Hsu Parties' "self help . . . tactics" as support for balancing the equities in its favor. It put forward evidence of the Hsu Parties' removing its parking signs and painting its wheel-stops in December 2016, in the wake of the September and October notices of renewal, and of the removal of the LED sign on the eve of a TRO hearing. The Hsu Parties respond that the injunction strips Landlord of the ability to "effectively enforce [Indian Brothers'] compliance with . . . [its] duty to keep its signs in a good, safe condition and to maintain necessary permits," citing the Lease's Compliance with Laws and Signs provisions. But the trial court's judgment provides for keeping the signs compliant with applicable laws and confirms that any new signs or changes to signs are still subject to Landlord's rights: Indian Brothers "may modify its existing signs and the marking on its reserved parking spaces as needed to comply with Texas Alcoholic Beverage Commission, City of Austin, and other applicable laws and regulations without need for approval by [L]andlord/Defendants" and that "[a]ny other signage changes or

31

additions by Plaintiff shall be subject to Landlord's approval pursuant to the Lease Agreement, Section 25 [('Signs')]."

Considering Indian Brothers' evidence and the Hsu Parties' response, we cannot say that the trial court abused its discretion by impliedly ruling that the balance of equities favored Indian Brothers. *See Storey*, 226 S.W.2d at 618–19; *Bloys*, 2004 WL 162974, at *11. We affirm the challenged injunctive relief and overrule the Hsu Parties' sixth issue.

## VII.    No error in award of damages for reinstalling LED sign

In their seventh issue, the Hsu Parties contend that the trial court erred by awarding Indian Brothers LED-sign reinstallation costs. This issue targets Conclusion of Law 7: "Plaintiff is entitled to recover from Defendants the sum of $2,360.88 for costs incurred in reinstalling Plaintiff's LED sign wrongfully removed by Defendants." The Hsu Parties argue that this ruling (1) is erroneous because Indian Brothers "fail[ed] to conclusively establish that these costs resulted from Defendants' breach" and (2) is unsupported by "evidence that the expenses were reasonable." We review the evidence-sufficiency arguments under the standards laid out above.

"The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained" as a result of the breach. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *accord Wong Grocery Co. v. Lambkin*, No. 04-16-00831-CV, 2018 WL 3369955, at *5 (Tex. App.—San Antonio July 11, 2018, pet. denied) (mem. op.) (citing *Phillips*, in suit over breach of commercial lease).

Under their first argument, the Hsu Parties say that costs incurred to reinstall the LED sign are not evidence of damages sustained as a result of a breach because removing the sign was not a breach. For this, they rely on their arguments under their third issue. The trial court

ruled that the Hsu Parties wrongfully removed the sign, which is in effect a breach ruling. As with the removal of the other signage in December 2016, Indian Brothers offered testimony of the Hsu Parties' removal of the LED sign. As under the Hsu Parties' third issue, the No Waiver provision does not apply because of Malik's testimony about post-Lease-execution oral permission for the LED sign, which supports an inferred waiver ruling beyond the reach of the No Waiver provision. As a result, legally and factually sufficient evidence supported the breach ruling about removal of the LED sign. *See Graham Cent. Station*, 442 S.W.3d at 263; *Saltworks Ventures*, 2018 WL 2248274, at *6. The Hsu Parties' breach argument thus fails.

Their second argument, about the costs' reasonableness, attacks the sufficiency of the evidence. Malik, in his testimony proving up the costs to replace the LED sign, separated out unrelated costs. He described hiring a sign company to reinstall the sign, hiring an engineer "to prove to [D]r. Hsu and his engineer that the sign was safe" as reinstalled, their respective work, and the resulting invoices. The first invoice charged $250 for replacing the sign, $653 for buying certain parking signs, and $930 for mounting those parking signs. Malik confirmed that only the $250 related to the LED sign. He also confirmed that the total amount of the second invoice, $2,110.88, stemmed from the engineer's work on the LED sign. The $250 plus the $2,110.88—$2,360.88—is what the trial court awarded. Malik's testimony and the invoices support the trial court's implied ruling that $2,360.88 was "just compensation" for the damages that Indian Brothers "actually sustained" as a result of the Hsu Parties' wrongful removal of the LED sign. *See Phillips*, 820 S.W.2d at 788; *Wong Grocery*, 2018 WL 3369955, at *5. There was no controverting evidence about these amounts for reinstallation, why Indian Brothers incurred them, or about the quality of the sign company's work. Thus, legally and factually sufficient evidence supported the

33

award.  *See Graham Cent. Station*, 442 S.W.3d at 263; *Saltworks Ventures*, 2018 WL 2248274, at *6.  We overrule the Hsu Parties' seventh issue.

## VIII.   No error as to attorneys' fees, expenses, and costs, but error as to expert fees

In their eighth issue, the Hsu Parties contend that the trial court erred by awarding Indian Brothers attorneys' fees, expert fees, expenses, and costs.  This concerns Conclusion of Law 8, which says: "Plaintiff is entitled to recover from Defendants Plaintiff's reasonable and necessary fees and costs as follow: a. $128,107.50 in attorneys' fees; b. $5,780.25 in expenses; c. $7,112.50 in experts' fees; and d. $507.49 in costs."  Indian Brothers bases its entitlement to these awards on Civil Practice and Remedies Code sections 37.009 and 38.001.  The Hsu Parties argue that neither statute supports the awards.  Under Section 37.009, they argue that Indian Brothers' "declaratory judgment claims were incidental to its core breach of lease claim," making fees and costs for those claims unrecoverable.  Separately about the expert fees, the Hsu Parties argue that expert fees do not constitute "costs" under statutes that authorize recovery of costs.  Independently, then, of entitlement to attorneys' fees and other "costs" under either Section 37.009 or Section 38.001, the Hsu Parties say that the expert fees are unrecoverable as a matter of law.

**Standard of review and applicable law.**  Every litigant generally must pay his or her own attorneys' fees, expenses, and costs, unless, as relevant here, a fee-shifting statute applies.  *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483–84 (Tex. 2019).  The availability of recovering fees, expenses, or costs under a statute is a question of law for the court, reviewed de novo.  *See State v. Buchanan*, 572 S.W.3d 746, 749 (Tex. App.—Austin 2019, no pet.); *Saltworks Ventures*, 2018 WL 2248274, at *12.

34

We interpret statutes by beginning with their plain language and applying their terms' common meanings. *Rogers v. Texas State Bd. of Pub. Acct.*, 310 S.W.3d 1, 6 (Tex. App.—Austin 2008, no pet.). We look at the statute as a whole, rather than as isolated provisions. *Id.* When statutory text is unambiguous, we interpret it according to its plain meaning, unless that interpretation would lead to an absurd result. *Id.*

"In any proceeding under" the Uniform Declaratory Judgments Act (UDJA), "the court may award costs and reasonable and necessary attorneys' fees as are equitable and just." Tex. Civ. Prac. & Rem. Code § 37.009. "The plain language of the UDJA authorizes courts to award equitable and just fees in *any proceeding* under the Act; it does not require the trial court to consider or render judgment on the merits of that claim." *Yowell v. Granite Operating Co.*, No. 18-0841, __ S.W.3d __, 2020 WL 2502141, at *14 (Tex. May 15, 2020). For contract causes of action, "[a] person may recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code § 38.001(8). "But when a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract, allowing fees under [the UDJA] would frustrate the limits [Section 38.001] imposes on such fee recoveries." *MBM Fin. Corp. v. The Woodlands Operating Co.*, 292 S.W.3d 660, 670 (Tex. 2009). When a UDJA claim "is merely incidental to other claims for relief" or to the "central theory of relief" in the suit, the plaintiff "cannot recover attorney's fees under" the UDJA. *Jackson v. State Off. of Admin. Hearings*, 351 S.W.3d 290, 301 (Tex. 2011). Such a situation occurs when the UDJA claim is "substantively subsumed within" the contract claim, is "part and parcel of the . . . contract claim," or "merely duplicate[s] issues already before the trial court" because of the contract claim. *See Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 298–99, 301 & n.59 (Tex. App.—Austin 2018, pet. denied).

35

**Application under Section 37.009.** Indian Brothers pleaded for "a declaratory judgment as to the construction and validity of the" Lease's renewal provision and "to have the agreement between [Indian Brothers] and Defendant landlord construed as to its parking and signage rights." It also pleaded for "[a] declaratory judgment that the . . . lease and renewal option are valid and enforceable and *defining the terms of such renewal, including* [its] rights to signage and parking." (Emphasis added.) In support of these pleadings, Indian Brothers elicited expert testimony from a licensed real-estate appraiser about the market value of the commercial complex and the resultant market rental value of the suites that Indian Brothers was renting. It also offered the expert's report as an exhibit, which was admitted. Indian Brothers offered this testimony and exhibit because the renewal option in the Lease provided that rent under the renewed Lease "shall be adjusted by then [sic] market rental rate of the retail center." Indian Brothers sought to establish the monthly rent under this provision, and, in response, the Hsu Parties offered their own expert's competing testimony and his report as an exhibit, also admitted, on the complex's market value and the market rental rate.

We conclude from these allegations and evidence that Indian Brothers' UDJA claim was not "merely incidental to [its] other claims for relief," or to its "central theory of relief," in the suit. *See Jackson*, 351 S.W.3d at 301. Indian Brothers could succeed on its contract and injunctive claims and simultaneously *not* see resolved the calculation of the monthly rent it would owe Landlord for any or all of the next 10 years. That is, Indian Brothers could succeed in securing from the trial court both the 10-year renewal and keeping its signs and parking spots free from interference without also needing to secure a declaration about what the rent would be. *Cf. Poole v. Karnack Indep. Sch. Dist.*, 344 S.W.3d 440, 445 (Tex. App.—Austin 2011, no pet.) (fees unavailable under Section 37.009 because "the result would be the same" if plaintiff were

36

successful on either UDJA claim or alternative claim). Instead, Indian Brothers could have left the rent determination for a later date. Therefore, Indian Brothers' UDJA claim, by which it asked the trial court to "defin[e] the terms of such [Lease] renewal," was neither "substantively subsumed within" the contract claim, merely "part and parcel of the . . . contract claim," nor "merely duplicat[ive of] issues already before the trial court" because of the contract claim. *See Craig*, 550 S.W.3d at 298–99, 301 & n.59. We conclude that the Hsu Parties' challenge to the recoverability of attorneys' fees, expenses, and costs under Section 37.009 fails. *See Jackson*, 351 S.W.3d at 301; *MBM Fin.*, 292 S.W.3d at 670. Because Section 37.009 authorizes those awards, we need not reach the Hsu Parties' arguments under Section 38.001.[4]

**Expert fees not recoverable.** As to the expert fees, however, we address the Hsu Parties' separate argument that statutes that authorize recovering "costs," as both Sections 37.009 and 38.001 do, do not thereby authorize recovering expert fees. "Costs" is the only portion of the two statutes under which Indian Brothers could claim expert fees because there is no other term within the statutes that could apply. *See* Tex. Civ. Prac. & Rem. Code §§ 37.009, 38.001. "Whether a particular expense is permitted by statute or rule to be recoverable as costs . . . is a question of law that we review *de novo*." *Wilson v. Whetstone*, No. 03-08-00738-CV, 2010 WL 1633087, at *12 (Tex. App.—Austin Apr. 20, 2010, pet. denied) (mem. op.). "'Costs' usually refers to fees and charges required by law to be paid to the courts or some of their officers, the amount of which is fixed by statute or the court's rules e.g. filing and service fees." *Id.* Therefore, "costs" generally does not extend to the expenses of an expert witness who was not appointed by

---

[4] The Hsu Parties argue that we must remand the awards of fees and costs to the trial court for redetermination if we reverse the award of a declaratory judgment under their fourth issue. Because we have overruled the Hsu Parties' fourth issue, we do not reach these remand arguments.

the court but who was instead a witness only for one side. *See id.* at \*12–13. That is the situation here. Indian Brothers sought recovery of expert fees for its licensed real-estate appraiser's work, and the amount awarded by the trial court matched the amount that Indian Brothers' witnesses testified was incurred because of the appraiser's work. We therefore conclude that the $7,112.50 for expert fees was unrecoverable. *See id.*; *see also Griffin v. Carson*, No. 01-08-00340-CV, 2009 WL 1493467, at \*7 (Tex. App.—Houston [1st Dist.] May 28, 2009, pet. denied) (mem. op.) ("It is well-settled that, regardless of any good cause shown, costs of experts are merely incidental expenses in preparation for trial and not recoverable." (internal quotation omitted)).

In sum, we overrule in part and sustain in part the Hsu Parties' eighth issue, render judgment that Indian Brothers take nothing on its claim for expert fees, and affirm the rest of the challenged awards of attorneys' fees, expenses, and costs.

## IX. No error in refusal to award Landlord attorneys' fees and expenses

In their ninth issue, the Hsu Parties contend that the trial court erred by refusing to award Landlord attorneys' fees and expenses. This issue depends on the Lease provisions about Landlord's right to terminate Indian Brothers' possession of the property when it "defaults in the payment of any of the rentals or other sums provided to be paid hereunder and such default shall continue for a period of ten . . . days after notice of such default." Under that provision, if Landlord exercises this right to terminate possession, then it may recoup "attorney's fees" and "court cost" only in the event that it collects rents from reletting or subletting the property to someone else:

> [Landlord] may, without terminating this lease, terminate the right of [Indian Brothers] to possession of the Leased Premises by giving [a specified notice], whereupon the right of [Indian Brothers] to the possession of the Leased Premises will terminate, and [Landlord] may take possession of all thereof, . . . and may sublet or relet the Leased Premises or any part thereof from time to time for all or any part of the unexpired part of the term hereof, or for a longer period, and

38

*[Landlord] may collect the rents from such reletting and/or subletting, and apply the same, first to the payment of the expense of re-entry and reletting, and including, without limitation, expense of removal and repairs, attorney's fees, court cost, and realtor's commission, and secondly, to the rentals herein provided to be paid by [Indian Brothers].*

(Emphases added.) No one argues that any such reletting or subletting took place or that Landlord collected any rents from reletting or subletting the property. Thus, the Hsu Parties have not raised an applicable fee-shifting provision. We therefore overrule their ninth issue.

## X. No waiver by Landlord of monthly CAM charges, as distinct from the calculation of the charges, by failing to invoice and assess the charges annually

In its sole cross-issue, Indian Brothers contends that the trial court erred by awarding the Hsu Parties "an offset attributable to CAM charges accrued for the years 2013–2015 because the [Hsu] Parties waived their rights to CAM charges older than one year by failing to reconcile and assess CAM charges annually as required" by the Lease. This cross-issue addresses Finding of Fact 16 and Conclusion of Law 11, in which, taken together, the trial court ruled:

(1)     Indian Brothers owed Landlord $8,640.43 for 2013 CAM charges, $9,363.96 for 2014, $9,930.96 for 2015, $10,497.32 for 2016, and $12,294.93 for 2017.

(2)     After applying payments made, Indian Brothers had remaining balances due of $2,065.39 for 2013, $2,788.92 for 2014, and $3,355.92 for 2015 but had overpaid by $2,506.97 for 2016 and $3,957.81 for 2017.

(3)     Adding the remaining balances and credits together led to the Hsu Parties' "entitle[ment] to an offset in the amount of $1,745.45 for unpaid CAM charges, against amounts owed by Defendants to Plaintiff" under the trial court's judgment.

This cross-issue requires that we review the trial court's implied conclusion of law interpreting the Lease—that it obligated Indian Brothers to pay the 2013–15 amounts—an issue we review de novo. *See Piranha Partners*, 596 S.W.3d at 743; *BMC Software Belg.*, 83 S.W.3d at 794.

The Lease's provision about CAM charges requires Indian Brothers to pay a proportionate share of the upkeep of the complex's common area "upon delivery of notice thereof":

> [Indian Brothers] agrees to pay as an additional charge each month for its proportionate share of the costs of operation and maintenance of the Common Area . . . , such payment to be made by [Indian Brothers] in advance for each month in the term of this Lease. The proportionate share to be paid by [Indian Brothers], based upon the estimated annual cost of operating and maintenance of the Common Area but subject to adjustment after the end of the year on the basis of actual cost for such year. Any such periodic charges shall be due and payable upon delivery of notice thereof. The initial Common Area Maintenance Charge, subject to adjustment as provided herein, shall be $0.00 per month.

Indian Brothers argues that this provision made Landlord responsible "for annual reconciliations and assessments of" CAM charges. The argument goes that Landlord "waived any claims for past due charges" from 2015 or before because it demanded unpaid charges only in December 2016. Indian Brothers does not challenge the rulings on CAM charges for 2016 and 2017 because it concedes that the December 2016 demand preserved those years' charges.

The relevant Lease provision lacks the annual invoicing and assessment obligation that Indian Brothers ascribes to it. Under the provision, Indian Brothers must pay an amount every month—an "estimated annual cost of operating and maintenance of the Common Area but subject to adjustment after the end of the year on the basis of actual cost for such year." If Landlord does not adjust for actual cost, Indian Brothers is not for that reason absolved of the obligation to pay; it simply continues to pay the estimated amount. A non-zero estimated amount had been in place at least as far back as 2007. Further, it is the "delivery of notice" that triggers Indian Brothers'

40

monthly obligation to pay. But the provision does not require Landlord to deliver the notice annually, monthly, or even more than once. A later notice may change the monthly amount owed, but until it does, an earlier notice suffices to trigger Indian Brothers' monthly obligation to pay the amount reflected in that notice, whether estimated or adjusted for actual cost. Indian Brothers' waiver argument under its cross-issue is thus unavailing. Any annual invoicing or assessment failure by Landlord is not unequivocally inconsistent with Indian Brothers' continuing monthly obligation to pay because the obligation itself, as distinct from its re-calculation to account for actual costs, does not depend on continual annual invoices. *See Chalker Energy Partners III*, 595 S.W.3d at 677 (waiver requires conduct unequivocally inconsistent with claiming known right). Indian Brothers does not challenge the calculation of the CAM charges—the parties stipulated to the amounts. We overrule Indian Brothers' sole cross-issue.

## CONCLUSION

We reverse the portion of the trial court's judgment that awarded Indian Brothers $7,112.50 in expert fees, render judgment that Indian Brothers take nothing on its claim for expert fees, and affirm the rest of the judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed in Part; Reversed and Rendered in Part

Filed: February 5, 2021

41